Mr. Glover, we'll hear from you first, representing Jessica Pate. May it please the Court, my name is Josh Glover, and I'm the attorney here representing Jessica Pate and her child for the purposes that today I'll just refer to the child as JLC, by the child's initials. As I'm sure the Court is aware by now, this is a little unique in when you look at some of the other opinions from the Fifth Circuit that mostly, where we talk about, I'm going to talk a lot about the Gates Standard, and I assume that's what we're all going to talk about today, most of those opinions come out after there's been a summary judgment and there's an issue of qualified immunity on a summary judgment. This case is a little different in that we're here after very quick proceeding on a 12B6 motion to dismiss on qualified immunity in which the district court down below dismissed all of the claims that Ms. Pate and her child have. So again, just to focus the Court, we're here essentially on the pleadings and to examine whether or not the pleadings here, as I've put them in the Court below in a first amendment complaint, are sufficient to state a claim, to state a constitutional violation, and to state a constitutional violation that should have been known by any government official acting in the capacity that the defendants herein were acting. And so, I'll start talking about what exactly I pled in the first amendment complaint since that's really the examination, at least in my view. What specific involvement do you allege on the part of the supervisors, Harbers and Chapman in the process? Harbers in particular is a little unique in this case, compared to other CPS cases I've handled in the state court, Harbers was present with the investigator Hunter. So Harbers, and I allege that in my first amendment complaint, begins at page I think 99 of the record, but I allege that in my complaint, that she was present. Not only was she present, she assigned Hunter to conduct the investigation. She was present when Pate was interviewed in the CPS offices there in Brenham. And she, by her own testimony, and I made this allegation in the complaint as well, because again, it's sort of unique, we have the benefit of testimony from a state court proceeding here, based on some of my complaint on, but she alleged what her decision was in that she made a decision on the removal. Now Chapman's different, Chapman's what you think of when you think of, or at least what I think of, when I think of a supervisor in one of these cases. Someone who's not in that office and in some other place. But she was here while the interview of Pate was being conducted in Brenham by Hunter and Harbers. Chapman was in the regional, I think they call it, it was either regional or district office up in Bryan College Station. So she was some distance away. Now Hunter, or excuse me, Harbers, as I've alleged in the complaint, said that she spoke to Chapman, who had the ultimate authority, at least that day, on whether or not to not allow Ms. Pate to return home with JLC. Is it your position that the deliberate indifference standard applies to your claims against the supervisors? No, I haven't made that argument at least, Your Honor. And I didn't brief it on that basis. My understanding on 1983 claims as to supervisor liability is you don't get some sort of either deliberate indifference or we may call it respondeat superior. They have to be, you have to have a direct claim against him and they did something that's a constitutional violation. And what authority do you have that there is a sufficient degree of involvement for direct supervisor liability against Chapman alleged? Against as far as I allege, I didn't allege any legal authority so much as I allege the facts that she was involved in the final decision to remove the child. And I'm asking what legal authority would support that pleading being sufficient on Chapman? I think Gates does, Your Honor. I think it's the same standard that you would see in Gates and it's in the Fifth Circuit's other opinions. Gates sure put a point on that pencil for this authority, but same thing you see in Wernicke. She had to make a decision, Chapman did, though she wasn't on the ground and on the scene, she had to make the same decision regarding where did exigent circumstances exist to not allow Ms. Pate to leave the CPS office with her child that day. So it's your position that because the child is at the CPS office, there is not an imminent danger at that time. And so therefore, it's not that they need to be removed from the home because they're at the CPS office and so they could go get what type of law enforcement tool they need to remove them. I'd like to be clear, Your Honor, that I agree that certainly by the time the child's at the CPS office, there's no imminent danger. But to be fair, I don't think that that was the department's thought process at the time and I don't know that that's operative. I mean, there's certainly instances when CPS may remove a child, the parent shows up after in a situation like this and CPS says, okay, don't let that happen again, here's your child, and then they may file a suit that afternoon or the next day or may just go into non-litigation, something they call a family services plan. I don't think that that's magic and I don't think that the fact that because we had this argument, an oral argument in the district court at least, I don't think there's any fact that there was sort of much ado made about, well, CPS didn't remove the child from Tanner's home because Pate, on the phone, consented to the transport of the child to the CPS offices. And I would certainly agree those are the facts and I don't think at that point, at that point that that's given rise yet to any sort of 1983 claim or constitutional violation. But when Pate shows up, and bear in mind and I allege this, she's coming from class in Bryan College Station, when she shows up and is interviewed, at that point in time, by the time, you know, a couple hours later, she's ready to leave, there are certainly no exigent circumstances. And I take the position even a little bit further that even at the time when the department showed up on Tanner's doorstep and they go through and they find the child with who's a two-year-old at that point, they find the child with a full diaper, the child's marked on himself with markers. So far, all things that, I don't know if you can take judicial notice of this, but not uncommon for a two-year-old, those two situations in any, in any environment, frankly. I have a son almost the same age as this child. But and then the fact that the only other fact at that point at the Tanner residence, and granted there were other allegations, but the facts as Hunter alleged in her affidavit is the only other thing that was found at that time was there was marijuana found in the master bedroom. Some box or something on the headboard, but found in the master bedroom, not in plain sight of the child, the child, and we've had these cases where, you know, law enforcement shows up and the child's playing with the meth that the parents kept under the television. This isn't that kind of case. So that's it at that point, and I don't think there were exigent circumstances at that point to remove the child, though granted, Ms. Pate consented to transporting the child. I think she was trying to cooperate with the department at that point, having been involved with the department before. And certainly the circumstances from that point didn't become any more exigent by the time she shows up in the CPS office in Brenham, conducts her interview, does the oral swab, and by the time she's done there. And, Your Honor, if you'd allow me to wrap back around, that reminds me of one other thing. You had asked about supervisor involvement on Harbors in particular. Not only was Harbors present, but if you'll recall, and I pled this towards the end of my complaint when I pled the facts on this in the first amendment complaint, at the time after Mrs. Pate, her oral swab was allegedly positive for amphetamines, she realized, and Hunter had said to her, well, you're not leaving with your child today. She asked to speak to Harbors, and she spoke to Harbors and had a conversation with her, and naturally the result of that was she still didn't get to leave with her child that day. So Harbors, like Hunter, had a very direct involvement, and frankly, though she is technically was the investigative supervisor at the time, her liability is not one of some supervisor liability. She's directly involved in not allowing Mrs. Pate to leave. Another issue that came up, and I'm not sure was briefed by the party so much in the motions to dismiss very closely, so much as it's something that in reviewing, again, the opinion that the district court issued on this dismissal was whether or not sort of the second prong of a qualified immunity analysis, and that's whether the constitutional right was clearly established at the time that the government actor made their alleged governmental misconduct. In other words, should it have been clear in this case to Hunter at least, and I'd argue Hunter, Harbors, and Chapman altogether, that this specific fact situation, that they should have realized that there were no, under the state of the law after Gates, that there were no exigent circumstances that would allow them to remove the child, and should they have understood that that's what the state of the law was at the time. The district court in its opinion really latched onto the fact that the plaintiffs, myself, had not brought forth a case with sufficiently similar facts. It seemed to me from the district court opinion that it was very specifically looking for facts of someone who had been away at school or somewhere else when a child was discovered and then had a history of having tested positive in the past with the prior removal and then had tested positive in an oral swab. And I really felt like that opinion, the district court's opinion in that matter, went way further than what Gates or Wernicke or any of the Gates progeny or even, frankly, cases before Gates even go with what that analysis is. What is the relevance of the early incident? Your Honor, from my opinion, I don't think it has any relevance as to whether or not there were exigent circumstances. And that's exactly where I was headed. I don't, my opinion of reading the law is that, and there's very similar state law regarding removals, is that you don't get to rely on something that happened two years ago necessarily when you're making a decision of are there exigent circumstances or not. Well, I guess you would, you would if that earlier circumstance involved the possibility of the child fleeing and whether that same circumstance existed again with any kind of reasonable possibility. Well, Your Honor, I would agree that you wouldn't make that analysis or the social worker in that case. And I'm realistic. I don't expect them, here Ms. Pate had a history with the department. The investigator involved originally was Ms. Harbers, who's now the supervisor in this second removal. I don't expect her to make any sort of analysis in a vacuum, but I don't know that that gets you to the point of exigent circumstances. And on the issue of fleeing, which I... What time of day was this? I mean, does it have anything to do with the fact that she could not get a court order that day? There's, yeah, there's been much made of that, Your Honor, and, you know, I think the court can take judicial notice of the day when this happened. I pled the time of day. It was during the week. It was in Washington County. There's a courthouse right there in the middle of Brenham. And they were up there for two hours or so, so during the middle of the day. I agree, Your Honor. Now, I'll be honest with you, again, because we're hearing a motion to dismiss the record, we don't have that developed of a record beyond what's in the complaint, though I allege the day that it occurred. Now, I didn't... I'll be the first one to admit, I did not make a specific allegation, frankly, I don't think it's required, but I did not make a specific allegation of the times the courtroom was open that day and the county court of law judge was or wasn't on the bench, and perhaps I should. The district court's found imminent... It was in danger of imminent physical neglect. In the opinion, it says physical neglect. Is that the same? Do we have case law that differentiates that or treats the same as imminent abuse? What the district court, in my mind, as I read it, hung its hat on was really the Warnakey opinion that, of course, came just after Gates. Gates is very clear, and I think the law even before Gates was fairly clear, and it's clear out of other circuits that the requirement for exigent circumstances is imminent, there's an imminent danger of physical harm or sexual abuse. Warnakey did... When you look at the facts of Warnakey, at least, Warnakey is arguably, and this is the argument that the district court essentially makes in its opinion, is that Warnakey is at its essence an endangerment case. The facts of Warnakey were generally, at least, that when the social workers came to the home that there was a child that had some medical problems, and there were medical supplies left. If I could reflect any kind of discussion with the mother and the services about whether she was going to go back to school and continue to leave the child unattended with her boyfriend, anything like that? I mean, there was, and again, perhaps I should have alleged it better in the complaint, but that's certainly what a good part of the two hours of Ms. Pate there at the Brenham office was. But, Sheldon, you said this is on a motion to dismiss, so we're looking solely at the complaint. Yes, Your Honor. I didn't make any allegations because, frankly, because of where we were with the proceeding, and I did have the benefit of some limited discovery in the state court proceeding. Simply I didn't have time, or not a matter of not time, but just not an opportunity to that two hours other than what, in the state court proceeding, what, of course, the department latched onto was. This is a motion to dismiss, filed on the basis of qualified immunity. Yes, Your Honor. So in that obligation, I mean, you had a heightened obligation with respect to pleading. I mean, it set out the facts in great detail. Yes, Your Honor. And that's more than just a motion to dismiss on 12b-6. I'm sorry, Your Honor. I mean, in other words, you had a, once they file a motion on qualified immunity, dismiss on the basis of qualified immunity, you have an obligation as a plaintiff to set out the facts in some detail, do you not? I don't disagree, Your Honor, and I felt fairly strongly, hence the appeal, that I had done that when I filed, when I amended the complaint after our first motion to dismiss. Okay. So you did amend the complaint? I did, Your Honor, and it became considerably longer when I amended it. That's what I'm asking. Yes, Your Honor. And I think I'm done unless someone else has something for me. Okay. Well, thank you, Mr. Klobuchar. Thank you very much. Ms. Barber, we'll hear from you. Good morning. May it please the Court. I'd like to start by addressing your question about the district court's finding on neglect. The district court did conclude that it was reasonable to believe that the two-year-old child in this case was in danger of imminent physical neglect under Ms. Pate's care. Now, Gates is very specific. Gates ties the standard to physical abuse. In Wernicke, this court expanded that and adapted those factors to a child endangerment scenario. Here, what we have, even if it is neglect, common sense teaches that when we're talking about a two-year-old, neglect— The age is critical. The age is critical because a two-year-old can't pour himself a glass of water. He can't even really ask for help. He can't change his own diaper. And to make things more dangerous, he's mobile, so he can create all kinds of situations for himself. So in that instance, neglect of that child poses an imminent danger to his physical safety. Now, what was the evidence of neglect here, other than that he needed a change in diapers? So the evidence of neglect is, first of all, that Ms. Pate had essentially ceded care of him and deserted him for at least three days that we know of, between the time the call came in and the May 9th, when CPS shows up. Was there any evidence whether that was irresponsible? I mean, is this the person in whose charge she left him, was he totally irresponsible and derelict in any kind of obligation to the child? Well, he certainly left the child uncared for, as evidenced by the fact that when the police and CPS showed up, he's in a soaking wet diaper, he's got—he's covered in marks from a highlighter, and the caretaker is then arrested for possession of drugs. So at that point in the morning when CPS goes to the Tanner home, there is then no adult left there to care for this child. And that's when CPS contacted Ms. Pate, who was two hours away in Brenham. Ms. Pate consented and said, I will have a family friend transport him to your office in Brenham. He can stay at the CPS office. And this plays into your question, Judge Elrod, about the location. The child was moved by a friend of Ms. Pate to the CPS office. Or was it that person a person that could care for the child? There's nothing in the First Amendment complaint that says either way. But common sense would say— But they're not on drugs or anything, that person. That's no allegation that that person's like the other person. No, ma'am, there isn't. There isn't. But there's also nothing in the record that suggests that that person was willing to care for that child. And the person wasn't on drugs at the time. They just had drugs in their bedroom, right? That is— I'm not saying that's a good thing, please. But, right, it's not that they were high at the time that they're supposed to be watching the child, right? The First Amendment complaint simply states that there were drugs found in the home, and I believe Mr. Tanner admitted to possession. But there's nothing in the First Amendment complaint that says that he was high at the time. That's correct. Why in the two-hour period could they not have followed a normal procedure and gotten a court order? In those two hours, it wasn't clear that a removal was going to be necessary, because at that time, if you're Ms. Hunter, you have spoken with Ms. Pate. Ms. Pate has said, I'm in College Station. I'm in class. It's OK for my friend to take the child to your office. I will be there as soon as I can to pick up that child. How far is College Station from? It's about a 90-minute drive. Ninety minutes? Roughly. I might be a little off. Mr. Clover might be able to answer that better than I can. It's less than two hours. Then after that fact, why couldn't they have gotten a court order once they became aware that they might need to take the child? So the district court noted in his opinion that just based on the course of the events that are alleged in the petition that the child was found at the home in the morning, there was at least a two-hour time lag between when Ms. Pate was contacted and when she arrived at the CPS office. And Mr. Clover has spoken about she was at the CPS office for roughly two hours before the decision was made to remove. But during that time, they could say, oh, we may have to remove. Let's prepare the paperwork and call the court and have them on standby that we're coming over. I mean, the normal kind of things you do in this sort of practice. It certainly is possible. There's nothing in the First Amendment. The First Amendment complaint doesn't state exactly what time of day the decision was made to remove. You agree that would have been a better practice. It may have been. It may have been. And that's not, but we're not here to determine whether they applied best practices. Right, right. And certainly from Ms. Hunter's standpoint, the goal is always to reunite the child with the parent. That's always the goal. And there really weren't enough, there wasn't enough suspicion on her part of the case. Until Ms. Pate arrived two hours later. I don't understand what she learned about the immediate danger that she didn't already know. Well, Ms. Pate showed up at the office two hours later and admitted to recent marijuana use and failed a drug test, tested positive for amphetamines. So when she contacted Ms. Pate in the morning, she would have had no way of knowing either of those two facts. All she knew when she contacted Ms. Pate in the morning was that Ms. Pate was in class and college station, that she had permission for the child to be transported to the CPS office, and it wasn't until Ms. Pate showed up at the CPS office much later that the immediate danger to the child became clear. And the immediate danger is not because of past drug use, it's because she's right then on amphetamines? It's both. It's that? It's certainly both. Well, past drug use, I mean, you still could get, it's not exogen at that point. No, past drug use is certainly not exogen at that point, but past drug use with a history of mental instability and current drug use, when we're talking about a two-year-old child who, as the district court pointed out, is wholly dependent on his caregiver for his safety, now the danger to the child's physical well-being is imminent. And the other thing on that is, when the child was at the CPS office, the child's in a safe location, in a safe environment. From Ms. Hunter's point of view, she has to make the decision. She knows she's going to go ask for a court order in the morning. So is the child going to be safe with that caregiver leaving this environment, being transported somewhere? It's not clear where from the First Amendment complaint. When that caregiver has just tested positive for amphetamines and is impaired. Now, in this county, do they not have after-hours orders? You know, in Harris County, they would, you can, at nighttime, I mean, so you're saying she's not going to go to the next morning. I'm curious as to that. It is not alleged in the First Amendment complaint that she could have gotten an after-hours order. And to my knowledge, that was not available at the time. But it's certainly not in the pleadings. But that's not the normal practice of that county, that they have a . . . Washington County is a smaller county, and so that may not have been available. And Washington County, I believe, is one of those counties where the judges are sitting in multiple counties at a time. But that is certainly not in the First Amendment complaint. So, as we've just talked about, the Gates factors have to be viewed in light of the fact that the child was in a safe environment at CPS and then would have to be removed from that while in the care of somebody who is impaired and has just tested positive for amphetamines. Judge Jolly, you asked about the relevance of the earlier incident and the time lag between the two. We're talking about a 2-year-old here, and there's roughly 18 months between the first incident where the child was first removed from Ms. Pate and the time of the May 2013 removal. That's a short period of time in the life cycle of that child so far. And what it suggests is a pattern. So, in the information available to Ms. Hunter on May 9th at that time, what she knows is that there is a caregiver who has a past history of mental instability and abuse and fleeing who is now trying to take the child from a safe environment while impaired. So, certainly when you're evaluating the totality of the circumstances, that has to be taken into account. Judge Elrod, you also asked about the supervisors and their liability. This court's opinion in Wernicke makes clear that a supervisor is only liable for constitutional violations if she acted or failed to act with deliberate indifference to the constitutional violation. In Wernicke, the court stated that it requires a mental state more blameworthy than negligence and something akin to a reckless disregard for the substantial risk to the child. Here, the First Amendment complaint, as to Ms. Chapman specifically, says that Ms. Chapman was on notice that exigent circumstances were not present. But Wernicke says that we have to look at this from a subjective standpoint. It's not that a reasonable person could have known. It must be that that person did know and deliberately ignored the risk to the child. But Harbers is more sufficiently pled. Yes. So, as to Ms. Chapman, the record is very thin. As to Ms. Harbers, though, it's still, she is almost like, in Wernicke, I believe it was Ms. Traynor, who was the supervisor in that time, who was a conduit of information between the investigator on the ground and the ultimate supervisor who approved. Here, although Ms. Harbers was present for this, she, as stated in the First Amendment complaint, merely confirmed Ms. Hunter's decision that the child would be removed. She was in the chain of authority but did not have the ultimate authority to approve the removal or to deny it either way. She didn't have the power to overrule Hunter? She certainly probably could have made a different recommendation if she wanted to, but it was Ms. Hunter's case. She's the one on the ground, but this other person, Harbers, is a supervisor over her, so she could say, no, you're wrong. She could. She could. But in order to state a claim that makes relief plausible, they have to overcome deliberate indifference, and there's not enough on this record just to say that she participated or witnessed the interview and then may have confirmed that the child was going to be removed. That's insufficient to meet a deliberate indifference standard. How do you employ the Gates multifactor standard on prong two? On prong two, so looking towards what's reasonable, it has to be viewed in light of the court's cautions that there's ample room for mistaken judgments, right, and that all reasonable Here, we just can't get that far. Her conduct, sorry, I'm looking for my page. Under Anderson v. Crichton, which is the Supreme Court case that essentially says even if the official was wrong, right, in that case, they went to the wrong house, the FBI went to the wrong person, and the Supreme Court still said that based on clearly established law and the facts known to that FBI agent at that time, those actions could still be reasonable such that he is protected by qualified immunity. Here, even if she were wrong that exigent circumstances existed, which I don't believe she was, she's still entitled to qualified immunity because her actions were reasonable under the circumstances. In fact, Texas law allows for emergency removal where a parent is visibly impaired by a controlled substance and that impairment poses a danger to that child, which is what we have here. I mean, on May 9, 2013, what Ms. Hunter knows is that the child has been taken from a place where it was not being cared for, where he was not being cared for. He's two years old, so he's totally dependent on the adults around him for his care, and that the caregiver, the only caregiver available from her point of view, has shown up essentially impaired despite the fact that this meeting was not a surprise. There's two hours between the time that Ms. Page is made aware that her child will have to be Let me ask a question. What does the record reflect, and I guess it's the first amended complaint, about visually impaired? It's one thing to say you have amphetamines in your bloodstream. I have no idea for how long those things last, but there's a difference between having it in your bloodstream and being impaired, visually impaired. What does the first amended complaint have to say about that? So the first amended complaint is silent on whether she was visually impaired. There's certainly an inference to be made that because Ms. Hunter felt compelled to ask her to take a drug test, that something would have compelled her to ask that. Well, her history might have done that, and would have, I would assume. I would assume that this request, that this person who asked to get this blood test done would think, boy, if I don't ask for that, I'm going to have a problem when I get back to my supervisor. So go ahead and get it. But the question whether, I don't know how long those things stay in your system. So to answer your question directly, the first amended complaint is silent as to it. Judge Sparks took judicial notice of both of the orders in the state court proceedings. In the sealed record before this court is the affidavit of Ms. Hunter that was submitted in the course of the state court proceedings. That was also presented to Judge Sparks, and he, in his opinion, noted that he was disregarding it for purposes of deciding the 12B6 motion, even though he felt he could properly take notice of it because it wasn't mentioned in the first amended complaint, he chose not to. So visible impairment is noted in the sealed portion of the record that is before you, and it was before the court, but he chose to ignore that particular affidavit. Okay, but if we can't use that because this is in the 12B context, what do you have to show that the mother was impaired? All I have is, in that case, I have the inference because the drug test was administered. Yeah, but who knows what that means. I mean, as I say, who knows how long those things remain in your system. You're going to have a positive blood test, I don't know, two days later. Who knows? The question is, what's your condition at the time that's at issue here, which is in that office? Certainly. You win without the mother being impaired if you don't have that in this record. Without the mother being impaired? At that point. We still have admitted recent drug use. We still have. That wouldn't be imminent, though. Admitted recent drug use would not be an imminent reason to take a child away, would it? For a 2-year-old, it could be. I mean, Ms. Harbers knows that she has just tested positive for amphetamines, and, yes, it's true that I don't know how long that stays in the system. Certainly there's a chance that maybe she was not impaired at that moment. I don't believe that to be true. She was going to classes. What school was she at? I don't know, but the answer was she was in class in College Station. So whatever she was, she was going to classes in College Station. So, you know, there's something to be drawn from that. Maybe she goes to classes impaired. Possibly. Possibly. And in this case. There's a lot of, I mean, you know, there's a lot about this case is right on the line because the fact that this baby had a very wet diaper, you know, and the fact that he, is it a he or a she? It's a he. That he had marked himself up with a marx-a-lot. Boy, that's, you know, great fun for him. You know, what. Well, those two facts. And here is this woman. I mean, I hate to say this, but she's off taking classes somewhere, obviously making some effort to better herself. I mean, you know, this case is hard. It is difficult, and in part it's difficult because we are here just on the pleadings, and so we don't have a big factual record. But in this case, just on the pleadings, there's not enough here to make Ms. Pate's claim plausible. There's not enough to overcome qualified immunity. Because from Ms. Hunter's standpoint, on May 9th, she has a child that she has just essentially rescued from a home that now has no adult caretaker because he has just been arrested. The child's in a soaking wet diaper cover. Yeah, but didn't the mother say that she was going to take care of the child? I mean, she knew that this man she'd left him with was out of the picture. Yes. And when she shows up two hours later, from Ms. Hunter's standpoint, she still then shows up and tests positive for drugs and admits to recent drug use. And so when we have a 2-year-old child that has to be cared for by a responsible adult, the danger to that child is imminent. I am almost out of time, but, Your Honors, on May 9th, 2013, the only persons who were protecting the physical health and safety of that child were the appellees in this case. And so we respectfully request that you affirm the district court's order. Thank you, Ms. Barber. Mr. Cloverley, you have five minutes for rebuttal. Well, I would sort of take great umbrage with that very last statement that the only people there to care for and look out for the child in this case on that day was the actors for the department. I mean, bear in mind, the record is clear that Ms. Pate came from College Station where she was in class. And I didn't say what class, but she was in a class in College Station. And she showed up at the CPS office after learning that the caregiver she had left her child with had been arrested at that point. And she shows up to pick up her child and take her child home. Now, I'd like to talk about a few things that y'all spoke with opposing counsel about. First of all, one of the issues was, and this came up a lot in the district court hearing as well, is was Ms. Pate visibly impaired? Okay, granted, and I conceded it, I pled it, that she certainly had self-admitted to prior marijuana use and told the CPS workers, told Harbers and told Hunter. What is under in your pleading, when she said that she had used marijuana in the past, what exactly did she say? My understanding is that is essentially what she said, is one of the first things she got asked was, hey, what about prior drug use? She, I think having had dealt with the department before is my supposition, but Ms. Pate was candid and said, I've used marijuana in the past, and so I would expect that would show up in a drug test. My guess, and it's only a guess because we haven't been able to develop that conversation yet because we're here just on the pleadings, but my guess is that's probably what made Ms. Hunter go, all right, here, take this. And I want to be clear, this was an oral swab drug test. Now, I went and looked through some Fifth Circuit opinions, and I haven't found yet where the Fifth Circuit has had occasion to review how well oral swab drug tests work. Was Hunter giving her the swab right then and looking at the result and then throwing it away? Literally going. According to your pleading? It is. They say chew on it, they look at it, and then. Is Hunter herself administering the oral swab amphetamine test? It is, Your Honor. And as to the issue of was she visibly impaired, I did not allege that she was visibly impaired because, frankly, I didn't think she was is my understanding. I did allege in my complaint that based on counsel's advice, that counsel being me, that when we were retained on it soon afterwards, we sent and we disclosed it to the department, and I pled it here in the complaint, hearing what she had said, we sent her for a urinalysis rather than just an oral swab. We couldn't get a blood test at the time, but we sent her for a urinalysis that indeed came back positive for THC. Now, Your Honor, as to your question about how long does that remain in the system, part of the problem is we're here just on the pleading, so we haven't had a chance to develop that like you would normally develop that through the use of an expert testifying about how long amphetamines stay in the system. Frankly, I think I know from some other cases, but, frankly, I don't know, and it would never be in the record here at this point, if amphetamines are out of the system in two days or two weeks in a urinalysis for those purposes. But I think that the inference certainly that the court may draw from having pled that is that if Pate is willingly, after she retains counsel, is willingly submitting to a urinalysis to confirm that, hey, I said I would test positive for THC. You gave me this oral swab that tests positive for amphetamines, which I disagree with, and, oh, by the way, it's gone now. No one can ever test that oral swab or has even seen it because it's been disposed of. But I felt so strongly about it that, and I will tell you from personal experience, it's incredibly rare to send your client for a drug test, but you go to a drug test in a urinalysis and it comes out exactly like you said. I think that speaks to was she visually impaired on that day. And, Your Honor, Judge Elrod, I think that something else that you asked about that's really important in this case that you asked about very early in opposing counsel's argument was, well, what, at the beginning of that two hours, you know, when did they develop some sort of, you know, exigent circumstances? When did those develop? And the concession was, well, she didn't know at that time. And I think once the child's there, I can't imagine on this set of facts as they are pled here what those exigent circumstances would be that were developed. And is N. Ray Pate in the 14th Court the latest, the last thing that was done in this case in the merits of the case about the child? In the state court proceeding, that was the mandamus that returned the child back to Ms. Pate. I don't remember exactly how long, but the actual state court case kept going. All the mandamus did was say, you may be subject to working with CPS, Ms. Pate, but at least give the child back while that's occurring. I can't promise you. It was approximately six months later when the CPS, when the state court proceeding was dismissed by the department. And I think I'm out of time. Okay. Thank you, Mr. Klobuchar. Thank you very much.